A. H. BULKLEY, RESPONDENT, v. FRANK A. THOMPSON, TRUSTEE OF ST. LOUIS AND SAN FRANCISCO RAILWAY COMPANY, A CORPORATION, APPELLANT.—211 S. W. 2d 83.

Kansas City Court of Appeals. Opinion delivered April 5, 1948.

590

*M. G. Roberts, E. G. Nahler, Thos. E. Deacy, Milligan, Kimberly &
Deacy* and *Poague, Poague & Brock* for appellant.

*Charles A. Calvird, L. M. Crouch, Jr., W. M. Kimberlin* and *Sam Mandell* for respondent.

BLAND, J.—This is an action for wrongful death. The suit is prosecuted by plaintiff to recover the statutory penalty, under Section 3652 R. S. Mo. 1939, for the death of his wife, Jane Weeks Bulkley. There was a verdict and judgment in favor of plaintiff in the sum of $7000, and the defendant has appealed.

Deceased met her death by having been struck by a locomotive owned and operated by the servants of defendant at the North Avenue crossing in the City of Belton. Defendant's railroad runs, generally, north and south but, as it extends southward and shortly before reaching the North Avenue crossing, it curves to the east. The crossing is in this curve.

The evidence shows that plaintiff, at the time of the death of deceased, on May 19, 1945, was 77 years of age, and deceased was 73 years of age. Deceased was in good health and her hearing and eyesight were good. Plaintiff and deceased lived about two blocks west of, and she was thoroughly familiar with, the crossing in question. At the time of the collision she was enroute from her house to meet her daughter at the bus station about two blocks east of the crossing. When she left home, on the morning of the tragedy, she was in good health and spirits. There was but one eyewitness to the collision, John W. Balke, who was the engineer on the train involved in the collision. He was called as a witness for plaintiff. He was not in the employ of the defendant at the time of the trial. He testified that the train in question consisted of an engine, tender, combination mail and baggage car, a day coach and two hospital cars; that the

train was about twenty minutes late; that it was a clear day; that the witness first saw deceased when she was about twenty feet from the west rail of the railroad tracks; that at this time the front end of the engine was about one hundred feet from deceased; that he could not have seen her sooner because of shrubbery and rubbish along the west side of the track and to the north of the crossing. Likewise deceased could not see the train approaching until she emerged from behind these obstructions, twenty feet from the crossing. He testified that the train was approaching at a rate of speed of about thirty miles per hour; that he did not reduce the speed of the train until he saw that deceased was going to get on the track; that he saw deceased walk the entire distance of twenty feet; that she was walking fast and was in the middle of the road or the street; that "she just kept a going;" that she was looking straight ahead and, at no time, looked toward the train. Asked if she threw up her hands or made any outward movement, he replied: "No sign whatever, that I know of"; that when he saw deceased come from behind the obstructions he immediately put the air in the emergency; that it was not possible to stop the train or reduce its speed enough to avoid the collision; that he was sounding the whistle as the train approached the crossing and had been sounding it at the different crossings to the north; that the engine was equipped with an automatic bell-ringer which was turned on and the bell had been ringing continuously from the first crossing north of the one in question.

The evidence shows that there are a number of highway crossings of the railroad to the north of the crossing in question; that the first crossing is four hundred feet, the second one hundred sixty-five feet from the first and the third seven hundred sixty-seven feet from the second.

Plaintiff's witness, Wernex, testified that he was building a fence at a point about four hundred feet west of the third crossing to the north of the one in question, which crossing, there was evidence tending to show, was 1340 feet north of the latter; that his hearing was good and he heard the noise and rumble of the train about one-half of a quarter of a mile or so to the north of where he was at work; that he saw the train pass over the crossing four hundred feet east of where he was stationed; that at that time he noticed the train. He testified: "I was busy building a fence and I just noticed the train, naturally, it had those Red Cross cars on it". He further testified that he heard the train whistle at a crossing a quarter of a mile north of the crossing west of which he was working, but he did not hear it whistle any more. He further testified: "I was working there and I never heard the bell ring".

Plaintiff's witness, June Washington, testified that she lived about a half or three-quarters of a mile north of Belton; (At one place she put the distance at a mile.) that she and her husband were building a

house there where they lived and that she and some persons were on the roof; that she heard the train whistle when it passed her house for a crossing located about two hundred feet south thereof; that it did not whistle for any other crossing; that her hearing was good; that she did not hear any bell ringing; that after the train had passed the house she came down from the roof, got into her car and started to Belton to get her mail; that she drove about three or four hundred yards back of the train as it proceeded toward Belton; that the train was proceeding somewhat faster than was she; that she heard no bell and did not hear the train whistle again; that she heard the rumble of the train a half a mile away.

Defendant produced a number of witnesses who testified to the effect that the whistle and the bell on the train were being sounded as the train approached the crossing where deceased met her death, and that the whistle was sounding almost continuously from a point several hundred feet north of the crossing.

The case was submitted to the jury under the humanitarian doctrine.

Defendant insists that the court erred in refusing to sustain his motion for a directed verdict. In this connection it is insisted that "there was no substantial evidence from any witness in a position to see, hear and know that no warning was given of the approach of the train and after deceased was in imminent peril".

We are unable to sustain this contention. The evidence of plaintiff's witnesses Wernex and Washington, was for the consideration of the jury upon the question as to whether any warning was given. It is claimed that these witnesses were not attentive and, therefore, their testimony to the effect that no warning was given, is not substantial evidence. It is pointed out that the witness, Wernex, testified that he was working on his fence. This is true, but it does not necessarily follow that he was not attentive and his testimony, as a whole, tends to show that he was. He heard the rumble of the train and he observed it when it passed over the crossing to the east and noticed that it had two hospital cars attached to it. His testimony, standing alone, was sufficient to take the case to the jury on the question as to the lack of a sounding of the whistle or the bell on the engine as it approached the crossing where deceased met her death. (Rosanbalm v. Thompson, 148 S. W. (2nd) 830, 832, 833.)

This is also true as to the witness, June Washington. As to this witness's testimony, it is claimed that, on cross-examination, she testified that she heard the train whistle on one occasion between the time she left her house and the time she arrived at Belton; that she did not know how many times it whistled. "Q. Now you say you do remember of hearing the train whistle on one occasion? A. Yes, sir. Q. How many times did it whistle then? A. I don't know how many times. Q. You don't know how many times. You do recall, Mrs. Washington, of hearing the train whistle on one occasion be-

tween the time you left your house and the time you got into Belton. A. Yes. Q. But you don't know how many times it whistled, is that what you just said? A. No. I said it whistled—I mean I heard it the one time when it whistled going by my house. The crossing was just a little ways down the road. Q. It whistled when it passed your house? A. Yes. * * * A. The train was even with my house when I heard it whistle, and the crossing is about 200 feet south of my house. Q. Oh, I see. And that is the last time you remember hearing any whistle? A. Yes, sir. * * * Q. You think that when you got on this witness stand and told the jury about driving down that road and not hearing that train whistle, that is the first time you have ever mentioned it to anybody. A. I never mentioned being on the roof of my house. No one ever asked me that. Q. Well, did you ever mention about going to Belton after this train passed and not hearing a whistle, did you ever mention that to anybody before today? A. No.

Viewing her testimony as a whole it was within the province of the jury to conclude that the witness was mistaken when she said she did not know how many times the train whistled and that she heard the train whistle on one occasion between the time she left her house and the time she arrived in Belton.

It is contended that the danger zone in this case was very narrow; that deceased was not in a position of peril until she took her last step or two toward the west rail of the track; that there are numerous cases in this state where the rule has been announced that a pedestrian is not in such imminent peril as to create any duty upon the operators of the train to avoid a possible collision until he takes the last step or two from a place of safety into a danger zone. There are cases so holding. (See Costello v. Pitcairn, 117 S. W. (2nd) 257, and cases cited; Knight v. Wab. Ry. Co., 85 S. W. (2nd) 392, 397.) It is also insisted that the mere fact that a pedestrian is oblivious does not extend the duty of the operators of the train under the humanitarian doctrine to take measures to avoid a possible collision at a point where the pedestrian is only *approaching* imminent peril. Such was held in Hilton v. Term. R. Ass'n. of St. L., 137 S. W. (2nd) 520. The statements made in these cases are well enough where the facts justify them, but the question of *obliviousness* does have a bearing in humanitarian cases. In speaking of the danger zone in Johnson v. Hurck Delivery Service, 187 S. W. (2nd) 200, 1. c. 202, the court said: "Under some circumstances it might be quite wide and yet under others it might be quite narrow and not much more than the pathway of the vehicle as the jury found it to be in this case". The facts in the case at bar come within the rule stated in State ex rel. v: Shain, 159 S. W. (2nd) 582, 586, as follows: "In this connection defendant cites Stark v. Berger, supra; Poague v. Kurn, 346 Mo. 153, 140 S. W. (2nd) 13; Clark v. Atchison, Topeka and Santa Fe R. Co., 319 Mo.

865, 6 S. W. (2nd) 954, and other cases, all of which we have examined. In each of the cases in which the right of a railroad company's employees to assume that a plaintiff will stop has been discussed, we have carefully limited this assumption by stating that the *facts must show nothing which discloses that the plaintiff is not intending to stop. In other words, the assumption cannot be universally relied upon. If the positive evidence shows conduct on behalf of the plaintiff indicating that he is going onto the track without stopping and this is discoverable by the agents of the defendant, their duty to warn remains.''* (Italics ours.) (See, also, Bollinger v. St. Louis & San Francisco Ry. Co., 67 S. W. (2nd) 985, 990) where the court said: ''A person may heedlessly and deliberately approach and go across a railroad track with bowed or averted head, looking neither to the right nor to the left, and oblivious of his surroundings, when, if he would but look, he would see a coming train and could avoid injury, yet, if the operator of the train sees, or by the proper care would see, such person going into or continuing in the danger zone, but oblivious of the impending danger, though negligent in being so, he must use all proper care and means to avoid injuring him''. And Elkin v. St. Louis Public Service Co., 74 S. W. (2nd) 600, 603, where it is said: ''If the team had been approaching rapidly, there might have been in that fact some suggestion that the driver intended to try to cross in front of the engine''. (See, also, Johnson v. Hurck Delivery Service, 187 S. W. (2nd) 200, 202; Burke v. Pappas, 293 S. W. 142; Womack v. Mo. Pac. R. Co. 88 S. W. (2nd) 368, 372; Perkins v. Term. R. Ass'n. of St. Louis, 102 S. W. (2nd) 915; Rosanbalm v. Thompson, supra; Chawkley v. Wab. Ry. Co., 297 S. W. 20, 23, 24.)

There is no question but that plaintiff made out a case for submission to the jury as to whether deceased was in a position of peril and oblivious thereto known to the engineer from the time she emerged from behind the obstruction which was twenty feet from the west rail of the tracks. At that time she was walking rapidly toward the tracks, looking straight ahead, giving no sign that she was aware of the approach of the train. The moment the engineer saw her coming from behind the obstruction he applied his emergency brakes, realizing that she was intending to cross the tracks.

Defendant calls our attention to the fact that the evidence in this case is undisputed that the train could have been heard approaching the crossing on account of the rumbling noise made by it. When the engineer saw that deceased was paying no attention to this noise it was incumbent upon him to give some other kind of sufficient warning. The sounding of the whistle is a louder noise calculated to give highway travelers better warning of the approach of the train. (Borrson v. Missouri-Kansas-Tex. R. Co., 172 S. W. (2nd) 826, 831.) See, also, on this point Perkins v. Terminal R. Ass'n. of St. Louis, 102 S. W. (2nd) 915, 923, where the court said where the ringing of the bell

is not sufficient, then it is the duty of the trainmen to blow the whistle. The same was held in Chawkley v. Wab. Ry. Co., supra, and Dutcher v. Wab. Ry. Co., 241 Mo. 137. So it is reasonable to say that if the noise made by the train is not effective some other kind of warning must be given.

In defendant's brief it is stated that, in this case, it must be assumed that deceased was walking at the rate of three or four miles per hour, and that if she was traveling at four miles per hour she was walking at the rate of six feet per second. Accepting defendant's theory as to this matter it is quite apparent that the engineer had several seconds in which to have sounded the whistle. The evidence shows that the whistle cord was immediately above his head and that he could have sounded the whistle almost instantly. The jury could have presumed that deceased would not have gone onto the track if an alarm had been timely given. (Rosanbalm v. Thompson, supra.)

It is insisted that plaintiff's evidence fails to establish that suit was filed by A. H. Bulkley within one year from the date of the death of Jane Weeks Bulkley, deceased. The facts in this connection show' that the suit was originally brought in the name of A. H. Buckley and that plaintiff, on the morning of the trial, announced to the court that the name of plaintiff and deceased was Bulkley and not Buckley, and asked that he be permitted to amend his petition, changing the name of plaintiff from A. H. Buckley to A. H. Bulkley and the name of the deceased from Jane Weeks Buckley to Jane Weeks Bulkley. The court, over the objection of defendant, permitted the amendment, stating, in effect, that it assumed that defendant had not been surprised. Defendant did not express any surprise or claim that he had been deceived in any way; but his counsel stated that the pleading could not be amended as plaintiff desired because ''plaintiff's purported cause of action is barred for the reason that it is not instituted within one year from the date of the death of the deceased''. Thereafter, defendant amended his answer by pleading that plaintiff's cause of action is ''barred because plaintiff failed to file any suit for the death of Jane Weeks Bulkley within one year from the date thereof''. There was no contention made at the trial that Jane Weeks Buckley and Jane Weeks Bulkley were not one and the same person, and that the plaintiff A. H. Bulkley is not the same person as A. H. Buckley, who brought this suit. In fact, the evidence is to the contrary. Defendant states that there is no evidence that A. H. Bulkley and A. H. Buckley are the same person. In this connection we find, from an examination of the transcript, that when plaintiff was asked on cross-examination how he spelled his name, he answered: ''B-U-L-K-L-E-Y''. ''Q. It is Bulkley? A. Bulkley, yes sir. Q. Not Buckley? A. No, sir, although I am called that most of the time. Q. Your wife's name, of course, was Jane Weeks Bulkley, B-U-L-K-L-E-Y? A. Yes, sir.'' We think it may be fairly stated that the

transcript discloses no dispute that the real name of the plaintiff and deceased was Bulkley although, at times, they had been referred to as Buckley. Merely changing the spelling of the name from Buckley to Bulkley did not change the original cause of action or allege a new one. (Maddux v. Gardner, 192 S. W. (2nd) 14, 18.) It was not necessary even for plaintiff to have amended his petition so as to show the name as correctly spelled. The two names are *idem sonans*. (Rubin v. Bassakin (No. West Tr. Co. Garnishee) 130 S. W. (2nd) 224, 226, 227.)

Complaint is made of the giving of plaintiff's Instruction No. 4. This instruction told the jury that if it found and believed from the evidence that deceased "was walking from West to East on North Avenue in Belton, Missouri, and at said time and place defendant, its agents and employees, was operating a train Southward on the tracks of defendant toward said North Avenue, if so, *and if you find that the decedent was in a position of imminent peril of being struck and injured by said train and was oblivious of its approach,* if so, and that it would have been apparent to a reasonably careful and prudent engineer in the use of ordinary care that she would continue to walk toward the crossing onto said tracks and be struck and injured by said train, if no timely warning of such danger was given, if so, and that those in charge of said locomotive knew or by the use of ordinary care would or should have known of all the above facts, if you so find them to be the facts, when she was far enough from said crossing and in time thereafter by using ordinary care and the means at hand and with safety to said train and those on it, *to have caused efficient and timely warning to be given of such danger,* if so, and have thereby caused her to stop before she reached the path of said train, if so, and if such efficient and timely warning had then and there been so given, if you find it was not, she could and would have so stopped, if so, *and that after she was in the aforesaid position of imminent peril, if so,* defendant failed to use ordinary care to give warning and gave no timely warning, if so, and that defendant was thereby negligent, if so, and that as a direct result of the aforesaid negligence, if any, of defendants, said locomotive struck the said Jane Weeks Bulkley and as a result thereof she was killed, if so, and if you find that there were no acts or omissions on her part which solely caused said collision, then your verdict must be for the plaintiff for the death of his wife, even though you may also believe she was herself contributorily negligent and thereby directly contributed to said collision". (Italics ours.)

It is insisted that this instruction submits two theories of recovery: (1) Failure to give warning before deceased entered a position of peril and while she was far enough away from the tracks to stop before reaching the path of the train. (2) Failure to give a warning after she was in a position of peril. We think there is no merit

in this contention. Defendant points to certain parts of the instruction which, standing alone, might be construed as defendant contends, but before these parts appears the following—"and if you find that decedent was in a position of imminent peril of being struck and injured by said train and was oblivious of its approach, * * *." All that follows this part of the instruction must be read in connection with it and when this is done there is no question but that the instruction is not subject to the criticism made of it by defendant. (Adams v. Thompson, 178 S. W. (2nd) 779.) It was not necessary for the instruction to designate the exact place where the position of peril began. "The exact point where the position of peril began was for the jury to determine under the evidence." (Perkins v. Terminal R. Ass'n. of St. Louis, supra, l. c. 923.)

We have examined the cases cited by defendant and find them not in point. The instruction in the case of White v. Kansas City Public Service Co., 149 S. W. (2nd) 375, is worded entirely different from the one in the case at bar.

It is insisted that plaintiff's Instruction No. 4 did not have the jury find that plaintiff, A. H. Bulkley, had instituted suit one year from the date of the death of deceased, Jane Weeks Bulkley. From what we have said the evidence is undisputed that Jane Weeks Bulkley and Jane Weeks Buckley were one and the same person. There was no contention at the trial to the contrary. The record shows conclusively that the suit was filed within one year from the date of the death of deceased.

It is insisted that the instruction is erroneous because it required defendant to give an "efficient or effective warning". The instruction does not use those words but the words "efficient and timely warning." Defendant says if it were proper to use the word "efficient" it should have required merely a "reasonably efficient and timely warning." Under the facts it was the duty of the defendant to use ordinary care to give an efficient and timely warning. This was an absolute and not a qualified duty. See Perkins v. Terminal R. Ass'n. of St. Louis, supra, l. c. 923, where it is held that under the humanitarian rule it is required that defendant give a warning that will be effective to overcome plaintiff's obliviousness. We do not consider Poague v. Kurn, decided by the Supreme Court (Division One) to hold contrary to what is stated in the Perkins case but, if it does, it is not the law, as the Perkins case was decided by the court en Banc. It is contended that under this instruction the jury could have found that it was the duty of defendant to sound short blasts of the whistle if the crossing whistle (the one that defendant's evidence tends to show was given) was not efficient. However, if the duty was not upon defendant to give any other than the crossing whistle warning, as defendant contends, and defendant was fearful that the jury might misunderstand the instruction, it was his duty to offer an instruction

limiting the effect of the one given. (Block v. U. S. Fid. & Guar. Co. of Baltimore, 290 S. W. 429; Dabbs v. K. S. Southern Ry. Co., 202 S. W. 276; Am. Paper Products Co. v. Morton Salt. Co., 279 S. W. 761.) The evidence was such that the jury could have found that the bell was being sounded but not the whistle. Under the circumstances it was not error to instruct the jury that the warning must have been an efficient one.

It is insisted that the court erred in giving plaintiff's Instruction No. 5. This instruction is on the measure of damages. It told the jury that if it found for the plaintiff it should assess plaintiff's damage at not less than $2000 nor more than $10,000, and in fixing the amount they should consider the mitigating and aggravating circumstances, if any. The instruction, as offered, was in correct form, but instead of using the words "plaintiff's damages", it used the word "penalty"; but the court, after the conclusion of the arguments, amended the instructions using the word "damages" instead of "penalty". Complaint is made of the giving of the instruction as amended. However, the only objection made to the instruction as amended was: "We object to the instruction." This amounted to no objection and did not comply with Section 122 of the Code and Rule 3.21 as to definiteness. Consequently, defendant is in no position to make this point. The same answer may be made to defendant's complaint that the instruction did not confine the jury to a consideration of the evidence; also, as to the contention that it erroneously submitted aggravating circumstances and when, as defendant contends, there was no pleading or evidence to authorize the submission of any such issue.

Plaintiff put the undertaker on the stand and, over the objection of defendant, he was permitted to testify that "there were parts of her (deceased's) body under the train and parts of it on the north side of the track." The admission of this evidence is now assigned as error, it being contended that there was no occasion for the admission of the same, it obviously being offered solely for the purpose of prejudicing the jury. The engineer testified: "I think she fell under the engine. I think she fell. There was no marks on the pilot. I went out and looked after the accident and I looked on the pilot and there was no marks on the pilot. The first marks I noticed was under the engine."

From the testimony of the engineer the jury might have concluded that, instead of the train striking deceased, she ran into the side of the engine. This, if true, might give an entirely different aspect to plaintiff's case. The evidence complained of would indicate that she was struck by the front of the engine. However that may be, there was no parading by this testimony of the mangled body of deceased before the jury, as was done in the case of Chawkley v. Wab. Ry. Co., 297 S. W. 20, cited by defendant. We think there is no merit in the contention of defendant.

In his argument to the jury plaintiff's counsel stated that, as a result of no warning having been given, "deceased was strewed in pieces over the tracks by" the engineer. At another time counsel for plaintiff stated in his argument: "Would she go and throw herself under the train and have her body mangled." Defendant complains of this argument to the jury but, as no objection was made to it, this complaint must be disallowed. In his argument to the jury plaintiff's counsel stated: "The humanitarian doctrine is a rule at law that is based upon the deep and abiding respect for human life." Objection was made to this argument, not because it was not the law, but merely because the court had not instructed this to be the law and that the argument was outside of the record. In reading the whole of counsel's argument to the jury we fail to find any misapplication of the law as related to the humanitarian doctrine, although, that doctrine was argued at length to the jury. We find nothing improper in the statement of counsel for plaintiff. Counsel for plaintiff told the jury in his argument that the court had instructed them that "when this engineer could have done something to have spared this life, and he failed to do it, there is liability in this case." Objection was made to the statement that "the engineer could have done something;" that the sole issue in this case was whether a warning was sounded, not whether the engineer could have done something. It is now contended that the argument was erroneous but, immediately following the objection, counsel for plaintiff stated: "Let's make it warning. Let's don't take up time. Let's make it warning." Counsel then proceeded to argue as to whether a warning had been given. We find nothing about this part of the argument of which just complaint can be made by defendant in view of the action of plaintiff in making the correction confining the subject to a warning.

Defendant's witnesses Thompson, Shelton and Stayton, were stationed at a filling station north of the crossing and east of the railroad tracks about seventy-five to one hundred feet away from the crossing. They testified that they saw the engine go by; that at the time it passed the whistle was being sounded; that they heard the whistle before the train reached and passed them; that the bell was ringing. In his argument to the jury counsel for plaintiff stated: "Now these three boys they talk about this morning, every one of them only heard the whistle when the train flashed by that station." Objection was made to this argument as to its being "improper," and the court ruled "The jury will remember the evidence." Defendant now complains of this argument. Plaintiff contends that he properly interpreted the testimony of these witnesses in his argument; but we think that plaintiff is in error in this contention. However, we do not feel that this incident is sufficient to justify a reversal of the judgment. This matter was brought to the attention of the trial court in the motion for a new trial, and the court was in a better

position to be advised as to the effect on the jury of this argument than are we. The matter of granting a new trial on account of an improper argument is one, largely, in the discretion of the trial court. (Morgan v. Doe Run Lead Co., 273 S. W. 244; Bishop v. Musick Plating Works, 3 S. W. (2nd) 256; Primmer v. Am. Car & Foundry Co., 299 S. W. 825, 827: Brinkman v. Gottenstroeter, 153 Mo. App. 351; Spengler v. St. Louis Transit Co., 108 Mo. App. 329, 336,) and we are in no position to hold that this discretion was abused in this instance. There were many other witnesses who testified that the whistle and bell were being sounded as the train approached the crossing in question and that they were sounding for several hundred feet before the train reached the crossing.

We have examined Stanton v. Jones, 19 S. W. (2nd) 507 and Flint v. Knox, 173 S. W. (2nd) 214, cited by defendant and find that both of them were aggravated cases and the facts in them were in no wise comparable to those in the case at bar. In the case of Beer v. Martel, 55 S. W. (2nd) 482, cited by defendant, the trial court granted a new trial and the Supreme Court commented upon the wide·discretion given the trial court in such matters.

It is claimed that the verdict is excessive. The only ground urged in this connection is that the court erred in submitting the issue of aggravated circumstances, and in permitting plaintiff's counsel to "prove the mangled and scattered position of deceased's body and permitted plaintiff's counsel to make improper argument."

Defendant's contentions ·as to the measure of damages instruction, the proof as to the position of deceased's body and the argument, have been ruled against him. Defendant assigns no other reason why the recovery of $7000 in this case is so grossly excessive as to warrant this court interfering with the verdict.

The evidence shows that plaintiff and deceased had been married about 48 years; that at the time deceased met her death she was in good health. She was a practical nurse and helped take care of plaintiff, whose health was not too good. She was a very efficient person. She earned $5 and $6 per week as baby sitter. She helped with the chickens and household duties, milked and did some sewing for a little business that her daughter operated. We are referred to no evidence by defendant in connection with the point made. We do not feel justified, under all of the circumstances, in holding that the verdict is such an amount as to warrant our interfering with it. (Steeger v. Meehan, 63 S. W. (2nd) 109, 115; Benton v. Thompson, 156 S. W. (2nd) 739.) The judgment is affirmed. All concur.